UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZURICH AMERICAN INSURANCE COMPANY,

        Plaintiff,

        - against -

FELIPE GRIMBERG FINE ART, et al.,

        Defendants.

**OPINION & ORDER**

**04 Civ. 763 (RLE)**

**RONALD L. ELLIS, United States Magistrate Judge:**

## I. INTRODUCTION

Plaintiff, Zurich American Insurance Company ("Zurich American"), filed this suit against Felipe Grimberg Fine Art, Fine Arts Services, Inc. d/b/a/ Felipe Grimberg Fine Art, Felipe Grimberg (collectively, "Grimberg") and John Does A-Z, on February 17, 2004. Zurich American's allegations arise from an insurance policy issued through its agent Acordia Northeast ("Acordia") on May 18, 1999. Zurich American raises claims (1) that the Fernando Botero ("Botero") painting *Tablao Flamenco* was not Property Insured under its insurance policy with Grimberg, and that Grimberg may not recover from Zurich American; (2) that the Court take notice of Grimberg's past judicial admissions, and that Grimberg be estopped from denying or altering the past judicial admissions; and (3) that the Court find John Does A-Z liable to Zurich for the painting if it is found that the Painting is Property Insured under the Policy.

Zurich American and Grimberg have filed cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Zurich American argues that summary judgment should be granted to it on the grounds that (1) Grimberg is bound by prior judicial admissions with respect to the Painting and is estopped from denying these admissions; and (2)

*Tablao Flamenco* was not Property Insured under the Policy at the time of loss and therefore Zurich American does not owe any coverage for its loss to Grimberg. Zurich American further argues that if summary judgment is denied the Court should grant partial summary judgment on the Third and Sixth Affirmative Defenses of its Answer by declaring that Grimberg is entitled to no more than $500,000 in coverage pursuant to the Policy's $500,000 limit of liability on any one loss at any other location, and that attorney's fees be denied.

Grimberg argues that summary judgment should be granted in its favor on the grounds that (1) *Tablao Flamenco* was stolen from him as part of a criminal scheme, trick or larceny by false promise; and (2) for the purposes of insurance coverage, title to *Tablao Flamenco* never passed from Grimberg.

On the facts as set forth in this record and for the following reasons, Zurich American's motion for summary judgment is **GRANTED**, and Grimberg's motion for summary judgment is **DENIED**.

## II. BACKGROUND

On May 18, 1999, Zurich American issued to Felipe Grimberg Fine Art insurance policy number IM 8338602, CTF #D279FL, for the policy period May 18, 1999, to May 18, 2000. (Chernow June 4, 2007 Aff., Ex. 1 (Merrett June 4, 2007 Aff. [hereinafter "Merrett Aff."] ¶ 4,).)[1] The Policy was renewed on May 25, 2000. *Id.* The Policy provides:

1. <u>PROPERTY INSURED</u>:

---

[1] The Plaintiff's main affidavit, written and sworn to by Jonathan S. Chernow, Esq., dated June 4, 2007, includes other documents by individuals. For example, John Merrett's affidavit is included as Exhibit 1.

(A) This policy insures antiques and object of art of every nature and description usual to the conduct of the Insured's business, being the property of the Insured; or held by them in trust; or on memorandum; or on consignment; or sold but not delivered; or owned on joint account with others; or belonging to others and for which the Insured may be liable; or for which the Insured has assumed liability prior to loss.
. . . .

LIMITS OF LIABILITY
The liability of this Company in any one loss, disaster or casualty is limited to:

| $1,000,000 | **Blanket over:** 1800 Sunset Harbor Drive, Miami Beach, Florida; Day & Meyer Warehouse, 1166 2nd Avenue, New York, New York and Fortress F.A.E. Worldwide Warehouse, 1629 N.E. First Avenue, Miami, FL. |
|---|---|
| $500,000 | At any un-named locations/in any one transit including personally conveyed anywhere in the **World**. |

(Merrett Aff., Ex. C, Ex. D (insurance policy renewal)) (emphasis in the original).

In or about July 2000, Michel Cohen ("Cohen"), with whom Grimberg had been doing business since the 1980s, contacted Grimberg regarding his interest in a possible purchase of a Botero painting. (Exs. on Behalf of Def. Felipe Grimberg, Ex. D, Grimberg Dep.); (Grimberg June 4, 2007 Aff. ¶ 6 [hereinafter "Grimberg Aff."].) With the intention of selling *Tablao Flamenco* to Cohen for $785,000, in August 2000, Grimberg traveled to Italy to purchase the painting from Dante Vecchiato Galleria D'Arte in Luca, Italy, for $720,000. (Grimberg Aff. ¶ 7.) Grimberg asserts that, consistent with custom and practice in the fine arts business, and consistent with business dealings between him and Cohen over the previous decade, he arranged to have *Tablao Flamenco* shipped to Cohen upon verbal agreement. *Id.* ¶ 10. Grimberg requested and on August 29, 2000, received an endorsement and $300 invoice from Acordia, his insurance broker, increasing the transit limit of insurance coverage for *Tablao Flamenco* from $500,000 to $785,000 from Pisa, Italy to New York, NY. (Merrett Aff. ¶¶ 8-9.) Grimberg paid

3

the additional $300 insurance premium, and *Tablao Flamenco* was insured for the duration of its transit from Pisa to New York at the intended selling price of $785,000. (Exs. on Behalf of Def. Felipe Grimberg, Ex. D, Grimberg Dep. at 9-11.)

On or about September 1, 2000, *Tablao Flamenco* arrived in New York and was delivered to Cohen's warehouse. (Merrett Aff. ¶ 11.) Cohen informed Grimberg that he had a client who wanted to purchase *Tablao Flamenco*, and they agreed that Cohen would pay Grimberg when he received payment from the client. (Exs. on Behalf of Def. Felipe Grimberg, Ex. D, Grimberg Dep. at 24.) Several weeks later, Cohen informed Grimberg that he had two Chagall paintings, *La Visite* and *Scene Biblique*, available for sale if Grimberg was interested in buying them. *Id.* After seeing photographs of the Chagall paintings, Grimberg agreed to purchase them by forgiving Cohen's debt of $785,000 for *Tablao Flamenco* and agreed to pay Cohen an additional $885,000. *Id.*

On or about October 30, 2000, Grimberg wired $885,000 to Cohen's bank account. Cohen then told Grimberg that he would send the Chagall paintings to him as soon as he received them. *Id.* In or around late November 2000 or early December 2000, Cohen called Grimberg to tell him that he had the Chagall paintings and to ask him what to do with them. *Id*. at 24-25. Grimberg decided to fly from his home in Miami, Florida, to Cohen's apartment in New York. *Id*. at 25. He saw the paintings in Cohen's apartment, and was prepared to take them back to Miami, but Cohen asked Grimberg to leave the paintings with him because there was a potential buyer. *Id*. Because Grimberg had not yet secured a buyer for the Chagall paintings, he agreed, and flew back to Miami without the paintings. *Id*. He viewed the paintings once more in Cohen's apartment before the end of the year, but again did not take the paintings with him. *Id*. Cohen

continued to assure Grimberg that he would pay him when the paintings were sold. *Id*.

In January 2001, Grimberg heard news for the first time that Sotheby's was filing suit against Cohen for a $10 million debt. *Id*. at 26. Upon hearing the news, Grimberg repeatedly tried to contact Cohen. *Id*. at 27. When Grimberg finally reached Cohen, Cohen reassured him that he would be paid soon. *Id*. at 28-29. Cohen disappeared soon thereafter, and Grimberg was never paid any of the proceeds from the sales of *La Visite* and *Scene Biblique*. (Merrett Aff. ¶ 15.)

In or about June 2001, Grimberg filed a claim with Zurich American's broker, Lloyd's Claims Office, for the alleged loss of *Tablao Flamenco*. (Merrett Aff. ¶ 2.) However, on October 17, 2001, during a recorded interview with Zurich American insurance adjustors, Cunningham International, Grimberg conceded that he sold *Tablao Flamenco* for $785,000 in August of 2000. *Id*. ¶ 10. Further, Grimberg again stated that he sold *Tablao Flamenco* to Cohen when he made Rule 26(a)(1)-(2) disclosures on November 8, 2002, in *United States of America v. Charles E. Davidson and Felipe Grimberg*, 02 Civ. 4789 (RWS) (S.D.N.Y. 2003). Grimberg also affirmatively stated in his Answer to Interpleader in *Davidson*, that he was the rightful owner of *La Visite* and that he agreed to buy, and did buy, *La Visite* and *Scene Biblique* in the fall of 2000 by giving a $785,000 credit to Cohen on a debt Cohen owed Grimberg, plus an additional $885,000. (Merrett Aff., Ex. O at 5.)

In his December 16, 2002 deposition in *Davidson*, Grimberg further stated that he sold *Tablao Flamenco* to Cohen in August 2000, and that in or around late November 2000 or early December 2000, when Grimberg went to Cohen's New York apartment to see the Chagall paintings, Grimberg testified that he knew that he owned the Chagall paintings, even though he

5

did not take them home to Miami with him. *Id.* Ex. E at 18. Ultimately, the Court in *Davidson* rendered judgment allowing recovery of *La Visite* to CED Enterprises, and denying recovery to both Davidson and Grimberg. (Chernow July 9, 2007 Aff., Ex. F.)

### III. DISCUSSION

At issue in this cross-motion for summary judgment is: (1) whether Grimberg should be judicially estopped from denying his prior statements regarding ownership of the painting; (2) whether *Tablao Flamenco* was Property Insured under the policy at the time of its loss; (3) if Zurich American's motion for summary judgment is denied, whether it is entitled to partial summary judgment on the Third and Sixth Affirmative Defenses of its Answer to Grimberg's counterclaim and declaration that, at best, Grimberg is entitled to no more than $500,000 in coverage; (4) if Zurich American's motion for summary judgment is denied, whether, it is entitled to partial summary judgment that Grimberg is not entitled to attorney's fees from Zurich American; (5) whether title in *Tablao Flamenco* remained with Grimberg; and (6) whether Grimberg retained an insurable interest in *Tablao Flamenco*.

### A. Standard of Review

Summary judgment is appropriate when no genuine issues of material fact exist; therefore, the moving party is entitled to judgment as a matter of law. *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), *cert. denied*, 524 U.S. 911 (1998). The moving party bears the initial burden of demonstrating that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating a motion under Rule 56, the court reviews the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, to show that there is no genuine issue of material fact." *Id*.

(quoting FED. R. CIV. P. 56(c)) (internal quotations omitted).  The court also reviews "the evidence in the light most favorable to the party against whom summary judgment is sought and [draws] all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles Inc.*, 138 F.3d 81, 87 (2d Cir. 1998).  However, a nonmoving party cannot rely on conclusory allegations or speculation, and "may not rest on the pleadings[,] but must further set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial."  *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Furthermore, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id*. at 249-50 (internal citations omitted).

B. **Grimberg is Judicially Estopped from Denying His Prior Statements Regarding Ownership of the Painting**

Zurich American contends that Grimberg asserted numerous times in another proceeding concerning ownership of *Tablao Flamenco*, that the painting had been sold and that he should not be allowed to deny those statements now.  The Court agrees that the doctrine of judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding." *Mitchell v. Washingtonville Central School District*, 190 F.3d 1, 6 (2d Cir. 1999), *quoting Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 10037 (2d Cir. 1993) (internal quotes omitted).  A party wishing to invoke judicial estoppel must show that "(1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first

7

tribunal in some manner." *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004) (quoting *Mitchell*, 190 F.3d at 6) (internal quotations omitted). The Supreme Court, however, has cautioned that a court must carefully consider the contexts in which seemingly contradictory statements are made to determine whether there in fact exists an irreconcilable contradiction. *Id.* at 119 (citing *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999)). To survive a motion for summary judgment, then, an individual must explain why his or her previous position or contention is consistent with his or her current position. *Mitchell*, 190 F.3d at 7.

Grimberg had consistently advanced the position that he owned the two Chagall paintings until judgment was rendered against him in *Davidson*. He admitted in his Answer to Interpleader in *Davidson* that he had purchased the two Chagall paintings from Cohen and transfered ownership of *Tablao Flamenco* to him. (Merrett Aff., Ex. O at 5 ¶ 4.) He attached a copy of a record of this wire transfer as an exhibit to this answer. *Id.* Further, he asserted that he was the "rightful owner" of the Chagall paintings because of his "contract" with Cohen. *Id.* at 4, ¶¶ 22-23. The position that Grimberg is advancing now–that he still owned *Tablao Flamenco* at the time of loss–is directly inconsistent with his previous position in *Davidson*.

While the court's reasoning in releasing *La Visite* to CED Enterprises, rather than to Davidson or Grimberg, is unclear, the court does appear to have adopted Grimberg's position in "some manner." *See* (Chernow July 9, 2007 Aff., Ex. F.) It was undisputed in *Davidson* that Cohen had "sold" *La Visite* to CED Enterprises, Davidson and Grimberg. Further, Grimberg offers no explanation for the inconsistency between his previous position and his current position, other than to state in his opposition to Zurich American's Rule 56.1 Statement that he

8

"denies" that his prior judicial statements are undisputed. Therefore, because Grimberg's prior position in another judicial proceeding contradicts his position in the present case, and because Grimberg's previous position was likely adopted in "some manner," Grimberg is bound to his prior statements and is estopped from advancing the position that he did not sell *Tablao Flamenco* to Cohen in the fall of 2000.

C. **The Painting was Not Property Insured Under the Policy After it was Sold to Cohen in 2000**

Because Grimberg is judicially estopped from advancing the position that he did not sell *Tablao Flamenco* in the fall of 2000 to Cohen, there is no issue of material fact concerning whether *Tablao Flamenco* was Property Insured under Grimberg's Zurich American insurance policy at the time of the reported loss. Therefore, the Court finds that no reasonable jury could find that *Tablao Flamenco* was Property Insured entitling it to coverage under Grimberg's insurance policy after its delivery to Cohen. Therefore, Zurich American's motion for summary judgment is **GRANTED**.

D. **The Fraud or Theft Exception to Delivery of Title Does Not Apply to This Case Because Grimberg Assumed the Risk of Transferring Title of the Painting to Cohen Without a Written Contract**

Grimberg argues that *Tablao Flamenco* was stolen by Cohen from him as part of a criminal scheme or trick or larceny, and that because the painting was acquired in this manner, consideration was lacking and title to the painting never passed from Grimberg to Cohen. Because stolen property is covered under the insurance policy with Zurich American, Grimberg asserts that *Tablao Flamenco* is Property Insured.

Under Section 2-401 of New York's Uniform Commercial Code, "Unless otherwise

9

explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place . . ." NY UCC § 2-401, (2). Accordingly, Grimberg's title in *Tablao Flamenco* was transferred to Cohen upon its delivery on September 1, 2000.

Grimberg argues that this case falls into an exception to the general rule because delivery was procured by fraud or theft. (Grimberg Mem. of Law at 2-3) (citing *Underwood v. Globe Indemnity Co.*, 156 N.E. 632 (N.Y. 1927) (holding that loss was covered by the insurance policy in a case where bonds were taken from a messenger by a thief posing as a customer, and that the bonds were still in transit within the meaning of the policy because these bonds were never delivered to a customer); *Hanson v. National Surety Co.*, 177 N.E. 425 (N.Y. 1931) (holding that the intent of the bond issued by the insurance company was to insure against a loss by larceny such as occurred when the intended purchaser took the stock certificates without payment)). Grimberg's reliance is misplaced. The plaintiffs in those cases were defrauded of their property. In contrast, Grimberg assumed the risk of non-payment through his informal dealings with Cohen. *See Sutro Bros. & Co. v. Indemnity Insurance of North America,* 264 F. Supp. 273 (S.D.N.Y. 1967), *aff'd*, 386 F.2d 798 (2d Cir. 1967). In *Sutro*, a securities broker [Sutro] had sold and delivered securities to a long time customer, Arlee, over a period of time without requiring certification of payment. *Id.* at 279-80. When Arlee stopped payment on the securities, Sutro sued his insurance company for indemnification on the unpaid for securities. *Id.* at 276. The court held that Sutro's insurance company was not responsible for the indemnification of securities that were delivered to, but not paid for by, Arlee because "the risk of non-payment was

assumed by Sutro" when he failed to obtain certificates of payment for the delivered securities over the course of their business relationship. *Id*. at 284. Sutro "was not tricked out of possession but surrendered the securities in accordance with practice long followed by Sutro." *Id*.

Here, as in *Sutro*, whatever fraud that occurred between Grimberg and Cohen occurred after the delivery of *Tablao Flamenco*, and the transference of title to Cohen. The fact that the parties had been working together since the 1980s, and that Grimberg did not think there was necessarily anything amiss when he did not receive payment immediately from Cohen for *Tablao Flamenco* indicates that it was not unusual for the two parties to conduct business in this way. At the time of delivery, Cohen was a "bona fide customer" and "delivery was complete although payment was deferred." *See Sutro*, 264 F. Supp. at 284. The delivery service that delivered *Tablao Flamenco* was not deceived or tricked out of possession of it, but surrendered the painting at a place and in a manner in accordance with the custom established between Grimberg and Cohen in their many years of doing business with each other. *Tablao Flamenco* was turned over willingly and Grimberg assumed the risk of non-payment. Zurich American, however, did not assume this risk because title passed from Grimberg to Cohen when *Tablao Flamenco* was delivered. Therefore, *Tablao Flamenco* was not "in transit" within the meaning of the insurance policy. The alleged fraud here occurred after the delivery of the *Tablao Flamenco* and the transfer of title, when Cohen sold the Chagall paintings and failed to give Grimberg the proceeds.

It is clear that Grimberg took risks by doing business in this manner with Cohen, without any written contracts or any transferences of certificates of ownership. Whether this is common practice in the art dealing industry or not, these were risks that Grimberg assumed, not risks his insurance company, Zurich American, agreed to assume.

E.  **Grimberg Has Not Shown That He Retains an Insurable Interest in the Painting**

Grimberg lastly asserts that he retained an insurable interest in *Tablao Flamenco*, and that such interest is covered under his insurance policy. An insurable interest in property depends on whether the person has a title to, lien upon, or possession of the property, and whether "by the existence of [the property] he will gain an advantage, or by the destruction of which he will suffer a loss." *Groban v. S.S. Pegu*, 331 F. Supp. 883, 894 (S.D.N.Y. 1971), *aff'd*, 456 F.2d 685 (2d Cir. 1972) (internal citations and quotations omitted). The insured bears the burden of proof. *Simons & Co. v. New Bar of N.A.,* 98 Civ. 5162 (GBD) 2005 U.S. Dist. Lexis 9043, *11 (S.D.N.Y. 2005). *See also Lawson v. Hotchkiss*, 125 N.Y.S. 261, 263 (1st Dept. 1910).

Because Grimberg is estopped from arguing that he did not sell *Tablao Flamenco* to Cohen in the fall of 2000, he "has not proffered any evidence from which a fact finder could find that his burden has been met." *Simons & Co. Tablao*, 2005 U.S. Dist. Lexis 9043, *11. *Tablao Flamenco* was sold to Cohen. Grimberg was not waiting for title to goods. He delivered *Tablao Flamenco* to Cohen, and whatever happened to it afterward, Grimberg would not gain an advantage or suffer a loss because it was no longer his property. Because the Court finds no insurable interest, it need not address the question of whether the interest of the kind Grimberg asserts is covered by Grimberg's policy with Zurich American.

F.  **Zurich American's Claims for Partial Summary Judgment**

Because Zurich American's motion for summary judgment is granted, the Court does not address whether partial summary judgment should be granted on the Third and Sixth Affirmative Defenses, limiting Grimberg's recovery to $500,000, or on Grimberg's request for attorney's fees.

## IV. CONCLUSION

For the reasons set forth above, Zurich American's motion for summary judgment is **GRANTED,** and Grimberg's motion for summary judgment is **DENIED**. The case will be dismissed and judgment entered for Zurich American.

**SO ORDERED this 11th day of February 2008**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**